```
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF RHODE ISLAND
_____
                                   )
DAVID COES,                        )
                                   )
        Plaintiff,                 )
                                   )
    v.                             )    C.A. No. 24-35 WES
                                   )
COMMUNITY COLLEGE                  )
OF RHODE ISLAND, et al.,           )
                                   )
        Defendants.                )
_____)
```

## MEMORANDUM AND ORDER

WILLIAM E. SMITH, Senior District Judge.

Before the Court is Defendants' Motion to Dismiss Plaintiff's Amended Complaint or, Alternatively, Strike Allegations Regarding Settlement Discussions ("Defendants' Motion"), ECF No. 14. For the reasons below, Defendants' Motion is denied in part and granted in part as to the Motion to Dismiss and granted as to the Motion to Strike Allegations Regarding Settlement Discussions.

## I.   BACKGROUND

The following is alleged in the Amended Complaint, ECF No. 13. Plaintiff David Coes was a student at Defendant Community College of Rhode Island ("CCRI"), where he was pursuing a degree in Diagnostic Medical Sonography ("DMS") with a focus in echocardiography. Am. Compl. ¶ 12. During the fall 2022 semester, Coes was participating in a degree-required clinical internship at

The Miriam Hospital ("Miriam" or the "Hospital"). Id. On Friday, October 14, shortly after completing his shift at the Hospital, Coes received an email from Defendant Paula Cardillo, the Director of CCRI's DMS Program. Id. ¶ 19; see also Defs.' Mem. Supp. Defs.' Mot. ("Defs.' Mem.") 10, ECF No. 14-1. Cardillo told him that someone at the Hospital had contacted her that day "regarding [his] clinical." Am. Compl. ¶ 19. She then forbade him from either returning to or contacting the Hospital "in any format." Id. Finally, Cardillo advised Coes that Defendant Maddie Josephs, the Chair of the department that oversees the DMS Program, would be reaching out to schedule a meeting with him for Monday, October 17. Id. ¶¶ 5, 19.

Coes replied: "What is going on? Did something happen today or in the past? I want to know what happened or supposedly happened. I think I have a right to know now." Id. ¶ 21. Cardillo did not respond, nor did Josephs reach out. Id. ¶ 22. Instead, after waiting over the weekend for more information, Coes received an email on Monday from Defendant Tracy Karasinski, CCRI's Dean of Students. Id. ¶¶ 8, 30. In that email, Karasinski told Coes that "CCRI is in receipt of concerns that were raised by your clinical setting last week," and that she wanted to "share and discuss the nature of these concerns" that day in person. Id. ¶ 30. Because he felt that any concerns could be shared via email, Coes was not

ready to speak in person, and he said as much to Karasinski. Id. ¶ 31. After Karasinski replied with what Coes deemed an evasive response, he lost his temper, telling Karasinski and others copied to the exchange that "at this point I no longer want to listen to CCRI's or Miriam's bullshit, therefore I ask that all of you kindly go fuck yourselves." Id. ¶ 34.

The next day, Tuesday, October 18, Coes received another email from Karasinski, which included a formal letter:

> Dear David Coes,
>
> I am in receipt of a report that alleges you have violated the Disruptive Behavior policy at your clinical placement site. Those violations are only allegations at this time and the college's disciplinary process is designed to determine the validity of those allegations and to fully include you in such a determination.
>
> The standard procedure in such a situation is to notify you of the complaint, as this letter does, and to arrange an initial interview. The initial interview is to review the complaint with you and provide you with an opportunity to respond, determine if there is sufficient evidence to support a complaint, and inform you of subsequent steps in the process if necessary. The initial interview is not an assumption of responsibility. It is part of the mechanism by which the college investigates complaints against students.

Id. ¶ 35. The letter asked Coes to respond by Friday, October 21, with times that he could meet for the initial interview; it further provided that an administrative hold had been placed on his account and that he had been served with a No Trespass Order for both CCRI

3

and the Hospital.  Id.

Coes replied to Karasinski's email with a letter of his own, which began with an apology for the "inappropriate and vulgar language" that he used in his prior email: "Although it does not excuse my actions, please understand that this entire situation has been very frustrating and stressful."  Id. ¶ 41.  He continued, "At this point, I still do not know what the allegations against me are.  All my requests for these allegations in writing have been denied or ignored."  Id.  Coes ended the letter with another request that "any allegations and evidence of these allegations be provided in writing."  Id.  He noted, however, that he could attend a meeting on short notice if CCRI once again declined his request. Id.

Karasinski responded a day later, explaining that the purpose of her previous email was to "share the allegations we've received, provide you with an opportunity to respond, and inform you of your due process rights."  Id. ¶ 42.  She then asked Coes to attend a meeting on the CCRI campus at 2:00 PM the next day (his No Trespass Order was lifted so that he could attend).  Id.

Present at the October 20 meeting were Karasinski; Defendant Robert Cipolla, Dean of Students; Defendant Suzanne Carr, Dean of Health & Rehabilitative Sciences; and CCRI Chief of Police Joseph Hopkins.  Id. ¶ 44.  According to Coes, Carr entered the meeting

and proceeded to read from a prepared statement dismissing him from the DMS Program for "unprofessional or unethical conduct pertaining to a violation of professional behavior in a clinical setting." Id. ¶¶ 47, 57. Coes objected to his dismissal as unfair because no specific allegations against him had been made; when he sought clarification as to the nature of the alleged violations, however, Carr responded, "I don't know, I wasn't there." Id. ¶ 53. Coes later received a formal dismissal letter in the mail, which merely repeated the assertion that he had engaged in unprofessional or unethical conduct and notified him that he was dismissed from the DMS Program "effective immediately, 10/20/22." Id. ¶ 63.

   The day after the October 20 meeting, Karasinski sent Coes an email to let him know that he could "file a grievance based on an academic decision" — which he did — and a meeting with CCRI's Academic Grievance Committee (the "Committee") was thereafter scheduled for November 4. Id. ¶¶ 73, 89. The day before his meeting with the Committee, on November 3, Coes received another email from Karasinski, which included a copy of an email that Hospital staff sent to Cardillo on October 14 (the day Cardillo first emailed Coes forbidding him from returning to the site). Id. ¶ 89. The October 14 email gave some insight as to the nature of the allegations against Coes. In the email, the staff member asked that Coes be prohibited from returning to the Hospital for

5

clinical purposes based on his "stated disagreement with our Possession of Weapons on Lifespan Property policy . . . and noncompliance with our Disruptive Behavior policy . . . ." Id. The email continued:

> David has repeatedly discussed his possession of weapons in great detail, in a manner intimidating to staff — including means of avoiding detection. He has told staff he disagrees with termination of a prior staff member who brought a weapon onto campus in violation of our weapons policy and stated he did not understand why she was not allowed to do so.
>
> Additionally, he has made other comments which staff find to be threatening and intimidating, including telling a staff member that someone was staring at her like he wanted to put her in a basement and lock the door.
>
> We do want to make it clear that David has made no direct threats to any staff or patients, however we do wish to end his internship at this time due to staff intimidation and policy noncompliance.

Id. Coes was questioned about this email during his meeting with the Committee. Specifically, "the [C]ommittee wanted proof that the content of [the email] was false," but all Coes could do was argue that the allegations were untrue. Id. ¶ 120. The Committee also informed Coes that, to their knowledge, Carr had already determined the truth of the allegations against him. Id. ¶ 118.

Sometime after the November 4 meeting, Coes received a letter from the Committee advising him that it agreed with Carr's decision to dismiss him from the DMS Program. Id. ¶¶ 134-135. Notably, the letter described a November 10 meeting between the Committee

6

and Carr — which Coes did not attend — where Carr provided additional details about the allegations against him. Id. ¶¶ 123-124. Carr told the Committee that "the conversations regarding weaponry," which "occurred over several weeks," were reported to the Hospital by five staff members and two physicians on October 14. Id. ¶ 124. She also informed the Committee that Coes had received no prior warnings about his conduct and that, other than the email Cardillo received from Miriam on October 14, there was no "documentation of the offenses (or a summary of the documentation)" that either the Hospital or CCRI could provide. Id. "After careful review of all the material presented and discussed at the hearing on 4 November, as well as the fact revealed at the 10 November Zoom meeting" with Carr, the Committee affirmed Carr's decision to dismiss Coes from the DMS Program for "violat[ing] the code of professional behavior in the clinical setting." Id. ¶ 135.

Coes sued CCRI and several of its employees in their official capacities in January 2024. Compl. 1, ECF No. 1. His Amended Complaint brings claims under 42 U.S.C. § 1983 for violations of his right to procedural due process, in addition to common-law tort claims for intentional infliction of emotional distress. Am. Compl. 39-47. He also seeks a declaratory judgment that Defendants violated his due process rights. Id. 47-48. He continues to deny

7

the allegations made against him.  Id. ¶ 95.

## II. LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint "must state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "Plausible," in this context, "means something more than merely possible, and gauging a pleaded situation's plausibility is a 'context-specific' job that compels [the Court] 'to draw on' [its] 'judicial experience and common sense.'" Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)).  To assess a claim's plausibility, the Court must first "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements." Id. Next, the Court must "take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief."  Id.

Although the relevant procedural rules still apply, pro se complaints are read "with an extra degree of solicitude." Rodi v. Ventetuolo, 941 F.2d 22, 23 (1st Cir. 1991); see also Andrews v. Bechtel Power Corp., 780 F.2d 124, 140 (1st Cir. 1985), cert. denied, 476 U.S. 1172 (1986) (citing Faretta v. California, 422

U.S. 806, 835 n.46 (1975)).

### III. DISCUSSION

Defendants' Motion consists of a Motion to Dismiss and a Motion to Strike Allegations Regarding Settlement Discussions ("Motion to Strike"). Defs.' Mot. 1. The Motion to Dismiss is granted in part and denied in part, and the Motion to Strike is granted.

#### A. Motion to Dismiss

In their Motion to Dismiss, Defendants argue that Coes does not state a procedural due process claim because he was dismissed from the DMS Program on academic rather than disciplinary grounds; therefore, he was not entitled to procedural protections beyond those he received. Defs.' Mem. 15-21. Defendants further contend that Coes does not plead facts sufficient to state a claim for intentional infliction of emotional distress and that his request for declaratory relief is not a separate and viable cause of action. Id. at 21-25.

The Court denies the Motion to Dismiss as to the procedural due process claim and grants the Motion as to the claims for intentional infliction of emotional distress and declaratory relief.

#### 1. Procedural Due Process Claim

The Fourteenth Amendment to the U.S. Constitution provides

that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Because "a student's interest in pursuing an education is included within the [F]ourteenth [A]mendment's protection of liberty and property, . . . a student facing expulsion or suspension from a public educational institution is entitled to the protections of due process." Gorman v. Univ. of R.I., 837 F.2d 7, 12 (1st Cir. 1988) (citing Goss v. Lopez, 419 U.S. 565, 574-76 (1975)). "Once it is determined that due process applies," however, "the question remains what process is due." Morrissey v. Brewer, 408 U.S. 471, 481 (1972).

In the realm of public education, the question of what process is due turns on whether the student was dismissed for disciplinary or academic reasons. See Bd. of Curators v. Horowitz, 435 U.S. 78, 87-90 (1978). If a student is facing a temporary suspension on disciplinary grounds, for instance, then due process requires "that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." Goss, 419 U.S. at 581. And when it comes to "[l]onger suspensions or expulsions for the remainder of the school term, or permanently," due process in the disciplinary context "may require

10

more formal procedures." Id. at 584.

But a dismissal for academic reasons "calls for far less stringent procedural requirements," Horowitz, 435 U.S. at 86, and does "not require a hearing as a matter of constitutional right," Hennessy v. City of Melrose, 194 F.3d 237, 250 (1st Cir. 1999). That is because "[a]cademic evaluations of a student, in contrast to disciplinary determinations, bear little resemblance to the judicial and administrative fact-finding proceedings to which [courts] have traditionally attached a full-hearing requirement." Horowitz, 435 U.S. at 89.

The difference between disciplinary and academic dismissals can be viewed along a spectrum. On the disciplinary end of the spectrum are dismissals that rest on objective findings of fact, such as those concerning specific incidents of student misconduct. In these cases, "[t]he requirement of a hearing, where the student could present his side of the factual issue, could under such circumstances 'provide a meaningful hedge against erroneous action.'" Id. at 89 (quoting Goss, 419 U.S. at 583). On the academic end of the spectrum are dismissals that rest on cumulative assessments of a student's academic performance or progress, which are "more subjective and evaluative than the typical factual questions presented in the average disciplinary decision." Id. at 90. Courts are hesitant to impose formal procedural requirements

11

when schools act on this end of the spectrum. "Like the decision of an individual professor as to the proper grade for a student in his course, the determination whether to dismiss a student for academic reasons . . . is not readily adapted to the procedural tools of judicial or administrative decisionmaking." Id.

Defendants acknowledge that "the precise line between academic and disciplinary decisions is not always clear." Defs.' Mem. 17. But they nevertheless insist that Coes was dismissed from the DMS Program for purely academic reasons. Id. at 18. As support, Defendants cite a line of cases in which dismissals for a lack of professionalism in clinical settings have been considered academic in nature. Id. at 17-18 (first citing Al-Dabagh v. Case W. Rsrv. Univ., 777 F.3d 355 (6th Cir. 2015), and then citing, inter alia, Ezekwo v. N.Y.C. Health & Hospitals Corp., 940 F.2d 775 (2d Cir. 1991)). Because "Coes' misconduct at the Hospital directly pertained to his professional fitness to remain in the [DMS] Program," Defendants argue that his dismissal "was clearly an academic matter." Id. at 18.

The problem with Defendants' argument is that it assumes the truth of the allegations made against Coes, even though the entire premise of his lawsuit is that the allegations are untrue. The Court recognizes that in educational settings like the DMS Program, where clinical practice is a necessary part of the curriculum, a

12

dismissal for lack of professionalism may amount to an "academic judgment." Al-Dabagh, 777 F.3d at 359. But here, CCRI's determination that Coes lacked professionalism turned exclusively on allegations from a third party (the Hospital) that CCRI accepted as true and which — based on Coes's description of his meeting with the Committee — he was not permitted to meaningfully contest. As Coes notes in his Amended Complaint, he had a 3.94 GPA and zero history of misconduct; additionally, he states that his clinical preceptor had given him a positive review and that he had received an A- for the most recent grading period. Am. Compl. ¶ 14.

The Court understands that academic dismissals, including those for lack of professionalism in a clinical setting, involve subjective determinations that are not amenable to judicial review. See Horowitz, 435 U.S. at 89-90. It further accepts that "[w]hen judges are asked to review the substance of a genuinely academic decision, . . . they should show great respect for the faculty's professional judgment." Regents v. Ewing, 474 U.S. 214, 225 (1985). Accordingly, in raising that Coes was by all accounts an exemplary student, the Court does not suggest that CCRI improperly weighed certain factors in its decision to dismiss him or otherwise erred as a matter of academic or professional judgment. Rather, the Court only points out that Miriam's allegations against Coes appear to have been the dispositive factor

13

in CCRI's decision to dismiss him from the DMS Program. If those allegations are true, and CCRI did more than what is reflected in the Amended Complaint to confirm their veracity, the Court will not second-guess CCRI's academic judgment. At this stage of the litigation, however, the Court takes the allegations as false, because that is what the pleadings contend. Schatz, 669 F.3d at 55. Therefore, to grant Defendants' Motion to Dismiss, the Court must find that Coes had no right to meaningfully contest the allegations against him because he was ultimately dismissed on academic grounds, even though he would not have been dismissed but for the allegations, and even though the allegations are assumed to be false.

The Court is unwilling to take that step. Matters of academic judgment are subjective. But if an academic dismissal hinges entirely on specific, contested allegations of student misconduct that are capable of objective verification, then a student is due more process than Coes was afforded here. Cf. Hennessy, 194 F.3d at 251 n.4 (noting that academic standing "may be premised on the absence of certain types of disciplinary problems," but warning that "educational institutions cannot avoid the constitutional protections that attend disciplinary proceedings simply by recharacterizing disciplinary issues in terms of academic standing"). Mindful that we are only in the pleading stage, the

Court finds that Coes states a plausible claim to relief for a violation of his due process rights.

### 2. Intentional Infliction of Emotional Distress Claim

Coes does not, however, state a plausible claim to relief for intentional infliction of emotional distress ("IIED"). "To create liability for [IIED] in Rhode Island, '(1) the conduct must be intentional or in reckless disregard of the probability of causing emotional distress, (2) the conduct must be extreme and outrageous, (3) there must be a causal connection between the wrongful conduct and the emotional distress, and (4) the emotional distress in question must be severe.'" Doe v. Brown Univ., 43 F.4th 195, 209 (1st Cir. 2022) (quoting Gross v. Pare, 185 A.3d 1242, 1246 (R.I.), as corrected (Aug. 16, 2018)). For the emotional distress to be severe, the plaintiff must "show some 'physical symptomatology resulting from the alleged improper conduct.'" Id. (quoting Vallinoto v. DiSandro, 688 A.2d 830, 838 (R.I. 1997)).

Even accepting the allegations in the Amended Complaint as true, Coes has not shown that Defendants' conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Hoffman v. Davenport-Metcalf, 851 A.2d 1083, 1090 (R.I. 2004). While Defendants' conduct may have been rushed or even unfair as alleged,

15

it falls short of the exceedingly high bar set for IIED claims.

### 3. Declaratory Judgment Act Claim

Coes invokes the Declaratory Judgment Act, 22 U.S.C. §§ 2201-2202, and asks the Court to declare that Defendants violated his due process rights. Am. Compl. 47-48. The Declaratory Judgment Act is not fashioned for that purpose, however, and should Coes prevail on his due process claims under 42 U.S.C. § 1983, then he will receive the relief he appears to seek in bringing this claim. See Steffel v. Thompson, 415 U.S. 452, 478 (1974) (Rehnquist, J., concurring) (finding the "primary purpose" of the Act "was to enable persons to obtain a definition of their rights before an actual injury had occurred"); Diaz-Fonseca v. Puerto Rico, 451 F.3d 13, 40 (1st Cir. 2006) (noting that "plaintiffs are not entitled to use the declaratory judgment device" to obtain duplicative or redundant relief). The Court therefore dismisses Coes's claims for a declaratory judgment that Defendants violated his due process rights.

### B. Motion to Strike

Defendants also move to strike allegations in the Amended Complaint related to settlement discussions between the parties. Defs.' Mem. 5. These allegations appear in paragraphs 168-183 of the Amended Complaint. Federal Rule of Evidence 408 "bars the admission of certain types of settlement-related evidence 'either

16

to prove or disprove the validity . . . of a disputed claim.'" Klauber v. VMware, Inc., 80 F.4th 1, 7 (1st Cir. 2023) (quoting Fed. R. Evid. 408(a)). Because the balance of the allegations in paragraphs 168-183 suggests that Coes raises the settlement discussions to prove the validity of his due process claim, the Court strikes all sixteen paragraphs from the Amended Complaint. Notably, Defendants do not move to strike paragraphs 180 or 181. Defs.' Mem. 5. Because paragraph 180 directly quotes from the proposed agreement that was the subject of the settlement discussions, and because the text of that agreement sheds light on the allegation in paragraph 181, the Court strikes both paragraphs from the Amended Complaint. See Fed. R. Civ. P. 12(f)(1) (allowing a court to strike "any redundant, immaterial, impertinent, or scandalous matter" from a pleading sua sponte).

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES in part and GRANTS in part Defendants' Motion to Dismiss Plaintiff's Amended Complaint or, Alternatively, Strike Allegations Regarding Settlement Discussions. ECF No. 14. First, the Motion to Dismiss is denied as to Count I of the Amended Complaint and granted as to Counts II and III. Second, the Motion to Strike Allegations Regarding Settlement Discussions is granted, and the Court strikes

17

paragraphs 168-183 from the Amended Complaint.

IT IS SO ORDERED.

*[signature: Westmith]*

William E. Smith
Senior District Judge
Date: April 15, 2025